**LAW OFFICE OF THOMAS K. BOURKE**
Thomas K. Bourke (SBN 56333)
Talltom2@aol.com
Maryam Azizi (SBN 279159)
Mazizi@bourkelaw.com
601 West Fifth Street, Eighth Floor
Los Angeles, CA 90071-2094
Telephone: (213) 623-1092
Facsimile: (213) 623-5325

**ROSEN & ASSOCIATES, P.C.**
Robert C. Rosen (SBN 79684)
robertrosen@rosen-law.com
John B. Wallace (SBN 93047)
johnwallace@rosen-law.com
Citigroup Center
444 S. Flower Street, Ste. 3010
Los Angeles, CA 90071
Tel:  213-362-1000
Fax: 213-362-1001

Attorneys for Plaintiff Dwight Brunoehler

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWIGHT C. BRUNOEHLER,<br><br>             Plaintiff,<br>       vs.<br><br>JEREMY R. TARWATER; CHARLES E. KEOPKE; TEN UNKOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION; AND TEN SUPERVISORY AGENTS,<br><br>             Defendants. | CASE NO.   15-CV-00688<br><br>**COMPLAINT FOR DAMAGES AND ATTORNEYS' FEES UNDER U.S. Const. Amends. IV and V and under** *Six Unknown Named Agents of the Federal Bureau of Narcotics v. Bivens***, 403 U.S. 388 (1971)**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Dwight C. Brunoehler hereby alleges upon information and belief:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331, as this action arises under the laws of the United States of America.

2. Venue is proper in the Central District of California because the Defendants either reside in the Central District or are subject to personal jurisdiction there as provided in 28 U.S.C. § 1391(c). Further, most of the events or omissions set forth in this Complaint occurred in the Central District. 28 U.S.C. § 1391(a) (2).

## II. PARTIES

3. Plaintiff Dwight C. Brunoehler is a citizen of the United States, and a resident of the State of Florida. Mr. Brunoehler held the positions of *Chief Executive Officer* and member of the Board of Directors for Biostem US Corporation from June 2011 until March, 2013. Prior to that, Mr. Brunoehler served as an advisor and held executive roles with several international companies operating in the biotech field.

4. Mr. Brunoehler founded *Cryobanks International* in 1993 and served as its President and CEO until 2008. He positioned Cryobanks to become one of the world's largest banks for donated unrelated umbilical cord blood. He developed partnerships between Cryobanks International and physicians and hospitals worldwide to further advance the usage of cord blood stem cells for transplant and non-controversial life enhancing research. He assisted numerous state legislators in drafting laws where expectant mothers were educated and informed of the benefits of cord blood donation. He was instrumental in drafting the first state cord blood awareness legislation of its kind in Illinois and Wisconsin.

5. During his career, Mr. Brunoehler coordinated numerous research and development partnerships to develop therapeutic benefits of cord blood stem cells. He is a

Complaint for Damages and Attorneys' Fees

past member of *The Cord Blood Work Group* and *the Finance Sub-Committees of the World Marrow Donor Association*. He has been an active member of the *American Society of Hematology* and a founding member of *the International Cord Blood Society*.

6. Mr. Brunoehler has lectured in numerous hospitals and universities throughout the world on cord blood donation. He engineered a worldwide network of licensed facilities to grow the inventory and availability of cord blood, where the first three locations opened in: **Athens, Greece, New Delhi, India and Bangkok, Thailand**. The Athens location became the first facility in Europe to be accredited by the American Association of Blood Banks.

7. Prior to his work at Cryobanks International, Mr. Brunoehler participated in a wide variety of successful ventures. He owned and operated many different businesses and held executive level positions in marketing, public relations and new product development capacities in both established and start-up companies, including seven years with the Bell System.

8. Among his many recognition awards are the *March of Dimes Corporate Volunteer of The Year Award*, and the *Florida Public Relations Association Golden Image Award of Distinction* for his work in promoting corporate volunteerism nationwide. He is a graduate of the *University of Central Florida*, and in 2007 was the keynote speaker at the commencement celebration for advanced degrees in the health sciences sector.

9. Defendant Jeremy R. Tarwater was at all times relevant to this Complaint a Special Agent with the Federal Bureau of Investigation (FBI) and based in its Los Angeles Field Office.

10. Defendant Charles E. Keopke was at all times relevant to this Complaint a Special Agent with the Federal Bureau of Investigation and based in its Los Angeles Field Office. Defendants Tarwater and Keopke are herein referred to as the (Named Agents).

11. Defendants Ten Unknown Agents of the Federal Bureau of Investigation (Unknown Agents) true names' are unknown to Brunoehler and sues them under these

fictitious names. Brunoehler alleges that these Unknown Agents are responsible in some manner for the acts and occurrences alleged within this Complaint. The acts and omissions of these Ten Unknown Agents were a substantial factor in causing Brunoehler's damages as each Defendant acted in concert with the others. Their names of the Unknown Agents shall be added to this Complaint as their identities become known.

12.     Mr. Brunoehler also alleges that supervisory personnel within the FBI and other agencies of the United States, particularly the Department of Justice (hereinafter referred to "Unknown Supervisory Personnel"), had responsibility for the implementation of personnel and policies concerning warrants, the supervision of the FBI Field Office in Los Angeles, and of the Named Agents and Unknown Agents.

13.     It is believed that Unknown Supervisory Personnel have personal knowledge of the facts alleged herein and have by action or inaction encouraged, permitted, and condoned the unconstitutional acts of the Named FBI Agents and Unknown Agents.

### III.     COMMON ALLEGATIONS

14.     On February 13, 2013 Mr. Brunoehler was wrongfully arrested — without probable cause and in violation of his right to Due Process of law — in his home in Florida under a sealed indictment (dated January 29, 2013). Brunoehler was indicted (along with other persons not parties to this action) by a Federal Grand Jury for *inter alia*, conspiracy to commit securities fraud and related offenses. U.S. District Court Judge Stephen V. Wilson dismissed the action against Brunoehler and the remaining unpled Defendants on March 25, 2014 on the Government's motion after extensive briefings and after holding several days' hearings on motions to suppress wiretap evidence." At the time of his arrest, Brunoehler knew nothing of the indictment, or that he was a target of a federal investigation or that his phone conversations with some of the defendants in that case were being taped, under an improperly obtained wire-tap warrant obtained by the FBI.

15.     The Supreme Court of the United States in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) held that a violation of a

4

person's constitutional rights by federal officers, acting under color of federal law, gives rise to a federal cause of action for damages for the unconstitutional conduct. As such, victims of a violation of the United States Constitution by a federal officer have a right under *Bivens* to recover damages against the officer in federal court despite the absence of any statute conferring such a right.

16. Mr. Brunoehler further alleges that the FBI agents named above, along with other Unknown Agents and Unknown Supervisory Agents, while acting within the course and scope of their employment with the Federal Bureau of Investigation, violated his rights guaranteed by the Fourth and Fifth Amendments to the United States Constitution when Mr. Brunoehler was: (1) subjected to wiretaps of his telephone conversations without probable cause; (2) was subjected to search warrants seeking documents of his that the FBI searched for in the homes of some his co-defendants in the underlying case; (3) when Mr. Brunoehler was indicted without probable cause; and (4) when Mr. Brunoehler was arrested without probable cause and deprived of his liberty and his right to Due Process of law.

17. The Constitutional rights under the Fourth and Fifth Amendments at issue were clearly established at all relevant times in this Complaint.

18. At all times herein mentioned, the Named Agents, Unknown Agents, and Unknown Supervisory Personnel were, and are, investigative or law enforcement officers as defined in 28 U.S.C.A. § 2680(h) of the FBI, the Department of Justice, and the Office of the United States Attorney for the Central District of Los Angeles. Each is an agency of the United States, acting within the course and scope of their employment with the United States.

19. Mr. Brunoehler claims damages under *Bivens* for any and all actual, compensatory, and punitive damages to which he is entitled by federal law including general damages, special damages and emotional distress damages, attorney fees, and costs according to proof at time of trial.

20. The United States is a sovereign governmental entity that has been engaged in, among other things, investigating and prosecuting violations of federal law (found,

*inter alia*, in Title 18 of the United States Code).

21.  The United States of America performs these activities by and through the following agencies: Federal Bureau of Investigation (FBI); the Department of Justice, and the Office of the United States Attorney for the Central District of California.

22.  At all times herein mentioned, the Named Agents and Unknown Agents were employed by the FBI. The acts of the named Agents and Unknown Agents were done under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the United States of America. Each of the Named Agents and Unknown Agents is sued individually in his or her capacity as a federal officer within the meaning and scope of *Bivens*.

23.  Mr. Brunoehler is informed and believes and thereon alleges that, at all times herein mentioned, the Named Agents, and Unknown Agents, and Unknown Supervisory Personnel were officers, employees, agents, and/or representatives of the United States Federal Bureau of Investigation, the Office of the United States Attorney for the Central District of California which is a subdivision of the United States Department of Justice, an agency for the United States of America.

24.  Mr. Brunoehler is informed and believes and thereon alleges that the Named Agents, Unknown Agents, and Unknown Supervisory Personnel were acting within the course and scope of employment of the FBI or the Office of the United States Attorney when they sought and obtained warrants to record Mr. Brunoehler's telephone conversations, search private property for his documents, indicting him and arresting him on February 13, 2013 without probable cause and without Due Process of law.

25.  Mr. Brunoehler is informed and believes and thereon alleges that, at all times herein mentioned, Unknown Supervisory Personnel were supervising officers, managers, employees, agents, representatives, or policy makers of the United States Federal Bureau of Investigation, the Office of the United States Attorney for the Central District of California, and/or the U.S. Department of Justice with both apparent and actual authority for setting down and implementing FBI operating policies, procedures, and practices.

26. Mr. Brunoehler is informed and believes and thereon alleges that Unknown Supervisory Personnel instituted and maintained the existence of the United States FBI policies, practices, and procedures; the purpose of some of which was to approve, ratify, and condone acts of misconduct of agents within the ranks of the FBI.

27. Unknown Supervisory Personnel have ignored a pattern of constitutional violations at the FBI's Los Angeles Field Office and, despite knowledge of such violations, failed to act to prevent the violation of Mr. Brunoehler's constitutional rights by the names Agents and/or Unknown Agents.

28. The Named Agents, Unknown Agents and Unknown Supervisory Personnel engaged in a pattern and custom where they became aware of and/or engaged in fostering a climate in which the constitutional rights of United States citizens were infringed. This was a contributing factor to the violation of Mr. Brunoehler's constitutional rights resulting in his arrest on February 13, 2013.

29. The Named Agents, Unknown Agents and Unknown Supervisory Personnel are individually responsible for the violations of Mr. Brunoehler's constitutional rights since they are a contributing factor to the Agents' misconduct.

30. In the January 29, 2013 indictment, Mr. Brunoehler was alleged to have issued press releases which contained material false and misleading information, and omitted material information, as part of a "Pump and Dump" scheme. As set forth in Defendant Koepke's February 11, 2013 Declaration in support of an application for a search warrant, seeking, *inter alia*, documents concerning Mr. Brunoehler, a "Pump and Dump" scheme is one where a company "issues press releases announcing supposedly positive developments to the public, which coincide with the positive stock recommendations and analysts reports and the corresponding rise in the price of the company's stock. When the investing public purchases these stocks, the co-conspirators sell their shares in coordination and stop promoting the stocks (the "dump") illegally profiting at the investor's expense."

31. But Mr. Brunoehler had never sold any stock he owned in Biostem, and information he caused to be disseminated in press releases was true. The Named Agents,

Unknown Agents and Unknown Supervisory Personnel had no probable cause to believe that Mr. Brunoehler was involved in any Pump and Dump" scheme, or committed any of the other violations of law alleged against him in the indictment, to obtain any search warrants, to listen to his phone calls, indict or to arrest him.

32. On March 15, 2011, Agent Tarwater caused to be filed an affidavit he signed with U.S. District Court Judge Dale S. Fischer in support of an application to wiretap certain target telephones. But the wiretap application did not demonstrate probable cause to support the requested order. The wiretap order was issued that same day. Agent Tarwater knowingly providing material false and misleading statements in his affidavit for the purpose of inducing Judge Fisher to issue the wiretap orders.

33. On April 13, 2011, Agent Keopke caused to be filed an affidavit he signed for continued interception of telephone conversations with U.S. District Court Judge Dale S. Fischer in support of an application to continue intercepting communications from target telephones. But the wiretap application did not demonstrate probable cause that an order should issue. The wiretap order was issued that same day. Agent Keopke knowingly providing material false and misleading statements in his affidavit for the purpose of inducing Judge Fisher to issue the wiretap orders.

34. On May 15, 2011, Agent Tarwater caused to be filed an affidavit he signed with U.S. District Court Judge Dale S. Fischer in support of an application to wiretap additional target telephones. But the wiretap application did not demonstrate probable cause that an order should issue. The wiretap order was issued that same day. Agent Tarwater knowingly providing material false and misleading statements in his affidavit for the purpose of inducing Judge Fisher to issue the wiretap orders.

35. On May 12, 2011, Agent Keopke caused to be filed an affidavit he signed for continued interception of telephone conversations with U.S. District Court Judge Dale S. Fischer in support of an application to continue intercepting communications from target telephones. But the wiretap application did not demonstrate probable cause that an order should issue. The wiretap order was issued the next day. Agent Keopke knowingly providing material false and misleading statements in his affidavit for the purpose of

inducing Judge Fisher to issue the wiretap orders.

36. In each of their applications for a wiretap order or continued wiretap order, Agent Tarwater and Agent Keopke swore that normal investigative procedures had been tried and failed. These statements were false, because the primary target, Sherman Mazur, had cooperated on his own with the FBI in the past, and there was no reason to believe he would not continue to cooperate with the FBI if asked. This fact was left out of Agent Tarwater and Agent Keopke's affidavits.

37. At the hearings on the motions to suppress in the underlying action before Judge Wilson, Agent Tarwater admitted there was no probable cause for the wiretap of Mazur that eventually ensnared Mr. Brunoehler:

> *Q: So to the best of your memory, did you reach a conclusion before that March wiretap about whether to include Mazur as a target?*
>
> *A: We did. We discussed how little we knew about his role, his knowledge, how little we knew about he fit in with the participants. And we came to the conclusion that he – we do not have P.C. to believe he was committing the target offenses.[1]*

Agent Tarwater also admitted on the stand that he knew the information he had given Judge Fischer in the wiretap application was false:

> *Q: So you knew that when you wrote these words . . . that Mazur had been previously interviewed with the FBI, and did not disclose his involvement with, or knowledge of the target subject – that that statement was false?*
>
> *A: It was not well put.*
>
> *Q: I'm not using the word "well put, and I'm not asking whether you agree with the word "well put." I'm asking you to use the word "false." You knew that statement was false, correct?*
>
> *A: Yeah, I don't think it's accurate.*
>
> *Q: Which is another way to say false, correct?*

---

[1] February 6, 2014 Transcript of Proceedings (TR) in Case Nos. CR-2013-0048 SVW and CR-2013-0062 SVW at 33.

A:   Correct.[2]

Agent Tarwater also stated:

> Q:   I think the Court pointed out, or asked you the question, in the entire affidavit, all 111 pages of it, do you include any of Sherman Mazur's past cooperation with the FBI?
>
> A:   No.
>
> Q:   And on March 2011 when you submitted this affidavit to Judge Fischer, I think you said you knew about Sherman Mazur's cooperation with the FBI in 2006, correct?
>
> A:   I said I knew he'd been interviewed, and I knew what I had been told by my supervisor.[3]

Finally, Agent Tarwater admitted he did not give Judge Fischer all the required information:

> Q.   But you didn't give Judge Fischer the facts so that she could make an independent determination herself [as to whether or not to issue the wiretap orders], correct?
>
> A.   Regarding the Mazur history, no, sir. At this point, no, sir.[4]

38.   Even Judge Wilson, recognized that Tarwater had misled Judge Fisher in issuing the wiretap orders.

> THE COURT:   So what has happened is that the agent's [Tarwater] position is that, yes, as you point out, Mr. Hochman, that there were consensual calls, they were in the files of the FBI. Your position is that a reasonable investigation would have turned these calls up and the transcripts of these calls, correct?
>
> MR. HOCHMAN: Yes, Your Honor.

---

[2] TR at 75.
[3] TR at 54.
[4] TR at 81-82.

> *THE COURT:     And that either the witness [Tarwater] is in reckless disregard, or more so, in not pursuing it, correct?*
>
> *MR. HOCHMAN: Yes, Your Honor.*[5]

39.     Unfortunately lying (or material omissions) by law enforcement officials is not just a one-off thing that occurred only in this case.  Last year former Chief Judge of the U.S. Court of Appeals for the Ninth Circuit, in a dissent, commented that misconduct by law enforcement officials is an "epidemic," and "[o]nly judges can stop it." *United States of America v. Olson*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, J., dissenting). Last month, in oral argument, former Chief Judge Kozinski ordered the attorney arguing from the California Attorney General's Office to contact the Attorney General to determine whether the prosecutor who gave false testimony in that case should be prosecuted for perjury.  Judge Kozinski stated: "It will look terrible when we write it up and name names."  The three-judge panel showed great concern that perjury by law enforcement official goes unpunished, and is the usual way of doing business. *Baca v. Adams*, 13-65132 (9th Cir. Jan. 8, 2013).[6]

40.     On Monday, prosecutors moved to vacate the conviction in a murder-for-hire case after it was disclosed that Riverside County prosecutors falsely denied that a key witness was rewarded for his testimony.

41.      Earlier this month, federal prosecutors from the Eastern District conceded they had failed to give exculpatory documents to lawyers for an environmental activist convicted of conspiracy in 2007. He was released from prison.

42.      In October, a federal judge in Los Angeles dismissed an indictment against two defendants in a health care fraud case after learning prosecutors failed to disclose details of a plea agreement with a witness.

43.     But for the omission that there were other less-intrusive, normal investigative procedures open to them, the wiretap orders would not have been issued and

---

[5] TR at 84-85.

[6] The video of the hearing can be found at: https://www.youtube.com/watch?v=2sCUrhgXjH4.

Mr. Brunoehler would not have been indicted and arrested, or suffered damages as a consequence. Other normal investigative procedures would have revealed that, for example, when Mr. Brunoehler was recorded saying there was "monkey business" going on at Biostem. But during course of his due diligence to the company, and only two months after his hire, he found numerous factual and procedural problems with the company which he reported to others as "monkey business," He then set out to fix the problems which he had outlined to Biostem's Board of Directors and key shareholders. The "monkey business" he was referring to was where Biotech employees had claimed to have a patent for technology to which they only had a provisional patent, and various other corporate issues. Mr. Brunoehler was reporting on the activities of Biotech employees prior to his hiring, not engaging in any "Pump and Dump" scheme. Other statements made by Mr. Brunoehler were otherwise innocuous statements. Or statements taken out of context, that gave the Named Agents, Unknown Agents or Supervisory Agents no reason to think there was probable cause that Mr. Brunoehler committed any of the crimes alleged in the indictment.

### CLAIM FOR RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
### (*BIVENS* ACTION)

44. Mr. Brunoehler realleges the preceding paragraphs as though fully restated herein.

45. This claim for relief is brought pursuant to *Bivens* for violations of Mr. Brunoehler's rights under the Fourth and Fifth Amendments of the United States Constitution because the Named Agents, Unknown Agents and Supervisory personnel Agents monitored and intercepted and monitored Mr. Brunoehler's telephone conversations, applied for, obtained and executed search warrants for documents concerning Mr. Brunoehler, caused Mr. Brunoehler to be indicted and arrested without probable cause. This claim for relief is to redress a deprivation, under color of authority, statute, ordinance, regulation, policy, custom, practice, or usage of a right, privilege, and immunity secured to Mr. Brunoehler by the Fourth and Fifth Amendments to the United

States Constitution.

46. During all times mentioned herein, the Named Agents, Unknown Agents and Supervising Agents acted under color and pretense of federal statutes, ordinances, regulations, policies, practices, customs, and usages of the United States of America.

47. During all times relevant to this Complaint, Mr. Brunoehler had the right under the Fourth Amendment to be free from unreasonable seizures by law enforcement officers without probable cause, and the right to be free from unreasonable searches and seizures of his person.

48. During all times relevant to this Complaint, Mr. Brunoehler possessed the rights guaranteed by the Fifth Amendment to not be deprived of liberty without Due Process of law, including but not limited to the right to be arrested by persons acting under the color of law that is intentionally or wantonly inflicted or which is accomplished with deliberate, reckless, or callous indifference to his constitutional rights.

49. The Named Agents, Unknown Agents, Unknown Supervisory Personnel, and each of them, acted specifically with the intent to deprive Mr. Brunoehler of the following rights and privileges guaranteed under the United States Constitution:

(1) Freedom from unreasonable seizures, in the form of intercepted telephone conversations without probable cause;

(2) Freedom from unreasonable searches, in the form of search warrants for documents concerning Mr. Brunoehler without probable cause;

(3) Freedom from unreasonable seizures, in the form of arrest without probable cause; and

(4) Freedom from a deprivation of liberty without Due Process of law.

50. After his indictment and arrest, Mr. Brunoehler suffered severe physical, emotional, and psychological damage as a result of the conduct of the Named Agent and Unknown Agents, and Unknown Supervisory Agents. Such damages includes, *inter alia*, the loss of Mr. Brunoehler's job as Chief Operating Officer at Biostem, and all income and employment benefits he was receiving under his contract with Biostem, and the loss of Mr. Brunoehler's wife who divorced him because of the indictment.

51. The Named Agents, Unknown Agents and Supervisory Personnel Agents subjected Mr. Brunoehler to the aforementioned deprivations by either actual malice or deliberate indifference and disregard of his civil rights.

52. As a direct and proximate result of the Defendants' actions Mr. Brunoehler suffered serious injury, included but not limited to feeling embarrassed, humiliated, worried, anxious, physically upset, fearful, chagrined, frustrated, angered, aggrieved, saddened, grief, impoverished, demoted, discriminated against, annoyed, anguished, pained, displeasure, exasperated, indignation, outrage, resentment, vexed, afflicted, irritated, and other assorted emotional distress and loss of enjoyment of life. Mr. Brunoehler has also suffered economic damages for lost pay, employment benefits (including front pay and retirement benefits). Mr. Brunoehler has suffered economic damages for the loss of time defending himself against the charges in the indictment that could have been put to his own best use. Mr. Brunoehler also suffered severe damage to his reputation.

53. The full extent of Mr. Brunoehler's damages is not known at this time, but he will amend this complaint to set the full nature and extent of such damages once they have been ascertained with particularity.

WHEREFORE, Mr. Brunoehler requests the following relief:

1. An award of damages for economic losses, back pay, front pay, employment benefits, physical injuries and emotional distress.
2. An award of punitive damages;
3. An award of costs, including attorneys' fees; and
4. Such other and further relief as the Court finds just and proper.

Dated: January 29, 2015     LAW OFFICE OF THOMAS K. BOURKE

By:/s/Thomas K. Bourke
Thomas K. Bourke
Attorney for Plaintiff Dwight C. Brunoehler

### JURY DEMAND

Plaintiff hereby demands trial by jury.

By: /s/Thomas K. Bourke
    Thomas K. Bourke
    Attorney for Plaintiff Dwight C. Brunoehler

Complaint for Damages and Attorneys' Fees